**UNITED STATES of America, Plaintiff,**

v.

**FORD MOTOR COMPANY, Defendant.**

**Civ. A. No. 75–1345.**

United States District Court,
District of Columbia.

Oct. 1, 1976.

Peter C. Schaumber, Asst. U. S. Atty., John M. Kelson, U. S. Dept. of Justice, Washington, D.C., for plaintiff.

Abe Krash, Arnold & Porter, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND GRANT OF SUMMARY JUDGMENT

HART, District Judge.

This action arises under the National Traffic and Motor Vehicle Safety Act of 1966 ("the Act"), 15 U.S.C. § 1381 *et seq.* (1970), *as amended*, (Supp. V 1975). The plaintiff, the United States, has moved for summary judgment requiring defendant Ford Motor Company ("Ford") to comply with an order of the National Highway Traffic Safety Administrator ("Administrator") issued under the mandatory defect notification and remedy provisions of the Act, 15 U.S.C. §§ 1397(a)(1)(D)(i)–(ii), 1412(b), 1415 (Supp. V 1975). Defendant Ford is a corporation organized under Delaware law and is a manufacturer subject to the provisions of the Act, 15 U.S.C. § 1391 (1970).

I

This case concerns an alleged defect in inboard pivot arm hinge pin brackets ("brackets") installed in the front bucket seats of 1968 and 1969 model-year Ford Mustang and Cougar automobiles. The brackets have been found to be subject to failure or breakage resulting from metal fatigue. After an investigation spanning a six-year period, the Associate Administrator of the National Highway Traffic Safety Administration ("NHTSA"), on March 13, 1975, informed defendant pursuant to 15 U.S.C. § 1412(a) (Supp. V 1975) that NHTSA had determined that a defect related to motor vehicle safety existed with respect to the brackets. After Ford had exercised its statutory right to present some of its own data, views, and arguments, 15 U.S.C. § 1412(a), the Administrator on August 12, 1975, ordered the defendant to furnish the notification and remedy specified in the Act, 15 U.S.C. §§ 1413, 1414 (Supp. V 1975), *i. e.*, to recall all affected vehicles and to repair or replace the affected brackets without charge to automobile owners. Ford has refused to comply with the Administrator's order, seeking instead

to litigate its propriety in the present enforcement action, brought by the United States under 15 U.S.C. §§ 1397, 1415 (Supp. V 1975). This action, it has been clearly established, is a trial *de novo* in which the United States bears the burden of proof. *United States v. General Motors Corporation*, 171 U.S.App.D.C. 27, 518 F.2d 420, 426 & n.7 (1975). In refusing to comply with the Administrator's directive Ford exposed itself to the risk of imposition by this Court, in the event Ford did not prevail in this action, of civil penalties not to exceed $800,-000. Such penalties are provided for by the Act, 15 U.S.C. § 1398(a) (Supp. V 1975) and were sought by the United States in this action. However, the Act also provides that the Court may, upon a preliminary showing by Ford of the strength of its case and of the reasonableness of its refusal to comply, stay the enforcement of civil penalties until the propriety of the Administrator's order is finally resolved, 15 U.S.C. § 1415(c)(1). *See Ford Motor Company v. Coleman*, 402 F.Supp. 475 (D.D.C.1975), *aff'd mem.*, 425 U.S. 927, 96 S.Ct. 1656, 48 L.Ed.2d 170 (1976). Such a stay was granted Ford by this Court by order dated February 18, 1976.

## II

The record now before the Court contains considerable evidence that the brackets here claimed to be defective pose a severe threat to motor vehicle safety. These brackets were originally installed in some 727,000 vehicles; of these vehicles it is uncontested that approximately 500,000 remain in service. Seat brackets in these vehicles, which function as the point around which the seat backs pivot when folded forward, and which support the inboard side of the seat backs against rearward stress when the seats are in an upright position, have shown a tendency to fail in significant numbers. It is clear upon the record before the Court that failure of the bracket, by its sudden and unexpected breaking into two parts, results in unforewarned collapse of the inboard side of the seat back, the seat back then falling rearward and rotating about the remaining outboard bracket. It is also clear on this record that frequent consequences of seat collapse are the following: the occupant may fall rearward; the driver may entirely lose control of the vehicle for a period of some seconds; he may lose contact with the brake and accelerator or experience a continuing impaired ability to brake; he may lose contact with the steering wheel or experience impaired ability to steer; his vision of the road may be lost; his vehicle may swerve from the proper path, and, in some cases, travel into opposing lanes of traffic or veer off the roadway. These consequences have been established by the testimony of twenty owners deposed by the Government and of twenty-three owners whose affidavits have been submitted by the Government. Each of these consequences was the common experience of at least a substantial minority of these forty-three deponents and affiants. *See* Plaintiff's Statement of Material Facts, filed August 26, 1976, and portions of the record cited therein. One of the most common experiences of drivers whose seats have failed has been the loss, to some degree, whether complete or partial, of control of the car for an appreciable period of time. *See id.* ¶ 20, and portions of record cited therein.

Failures of the bracket can, according to the plaintiff's affiants and deponents, occur apparently at any speed: failures have occurred at speeds of 60 m. p. h. (*e. g.*, Kaiyalethe deposition, page 12); 50–55 m. p. h. (*e. g.*, Gosser deposition, pages 15–16, 20; Lempenau affidavit, page 3; Coolidge affidavit, page 2; Chiaravallo affidavit, page 1); 40 m. p. h. (*e. g.*, Pearlman affidavit, page 1); 30–35 m. p. h. (*e. g.*, Roth affidavit, page 2; Dunlop affidavit, page 1; Marconi affidavit, page 2; Hess affidavit, page 1); 20–25 m. p. h. (*e. g.*, Hartz affidavit, page 1; Karpathi-Molnar affidavit, page 1; Reynolds affidavit, page 2; Whitehead affidavit, page 2). Other failures have occurred at lesser speeds or when the car was stationary. Immediately following the bracket

failures drivers have lost control of their cars for periods they estimate at up to 30 seconds (e. g., White affidavit, page 2); 15–20 seconds (e. g., Krosky affidavit, page 2); 10–15 seconds (e. g., Wilbur A. Smith affidavit, page 2); 5–10 seconds (e. g., Reynolds affidavit, page 2; Reed affidavit, page 2; Hartz affidavit, page 2; Dunlop affidavit, page 2). Other owners have managed to stay at least partially in control. The cars of some drivers who experienced failure have swerved into or across opposing lanes of traffic (e. g., Kaiyalethe deposition, pages 13–15; Hoggard deposition, page 18; Gosser deposition, pages 12–14; Krosky affidavit, page 2; cf. DeLava affidavit, pages 2–3) or toward the right over the curb (e. g., Salem deposition, page 8). Even failures occurring at low speeds or when cars are stationary have resulted in similarly endangering traffic situations (e. g., car rolling down incline, across street, into tree, Zigalka deposition, page 39; car entering intersection against red light, Hess affidavit, page 2; car rolling from parking space into driving lane, Bailys affidavit, pages 1–2).

Deponents and affiants have also attested to physical injuries occurring as a result of seat back collapse itself (and not due to vehicle collisions) (e. g., "backache," "severe pain," at times "can't even walk," Salem deposition, pages 24–26; back injury resulting in hospitalization and in traction for two weeks, Gosser deposition, pages 15–16, 20; removal of herniated disc, out of work four months, Turek deposition, pages 16–17, 23; removal of chipped bone from knee, Bellinghausen deposition, pages 41–42) and to property damage due to collisions with stationary objects (e. g., $300 damage, Bonet deposition, page 25; $300 damage, Hoggard deposition, page 44).

Ford has conceded that failures have occurred in the past in "significant number." See Answers and Objections by Defendant to Plaintiff's First Set of Interrogatories, filed November 3, 1975, pages 1, 4. During the warranty period of the cars in question (the warranty for the 1968 model year extended 2 years or 24,000 miles, and for the 1969 model year, 1 year or 12,000 miles), it is conceded that the number of failures was at least 11,000. See id., page 4; Weart deposition, page 197.

It is further uncontested that failures of the brackets have continued after the warranty period. Defendant Ford's exhibits submitted in support of its motion to stay civil penalties reflected results of a survey of 353 original owners of 1968–69 Mustangs and Cougars who reported failures of the bracket continuing through 1975 in substantial numbers. See Defendant's Exhibit 20A, page 16. Defendant further does not contend that the bracket is not now failing or will not fail in the future. See Answers and Objections of Defendant to Plaintiff's Fifth Set of Interrogatories, filed August 23, 1976, ¶¶ 27, 29. It is clear that the nature of metal fatigue failures is such that it may be inferred, if not presumed, that the older the car and the longer stress is applied, the more likely the bracket failure. See Transcript of Proceedings, December 17, 1975, page 20. Further, plaintiff's Exhibit 11, consisting of internal Ford documents, reports a survey in 1972 of dealers in the ten largest of Ford's 34 districts showing an average of one or two bracket failure complaints per month per dealer (Ford has 6,800 dealers).

### III

In support of its motion for summary judgment the United States relies in the main upon the facts recited above, many of which are uncontested or formally conceded by Ford. Ford, in opposition to plaintiff's motion, has sought to raise only one genuine issue of material fact, which it states as follows: "[w]hether a significant number of serious accidents and injuries is likely to occur in the future as a result of [bracket] failure." Defendant's Statement of Genuine Issues, filed September 13, 1976, page 1. In support of its contention that this issue is properly one for trial, Ford argues that the record reveals only a de minimis number of past accidents and injuries, and con-

tains no evidence as to any future risk to safety due to future failures of the bracket.

## IV

■ The Act requires a determination by the Administrator before notification and recall are ordered that there exists "a defect which relates to motor vehicle safety." 15 U.S.C. § 1412. "Defect" is defined in the Act as follows:

> any defect in performance, construction, components, or materials in motor vehicles or motor vehicle equipment,

and "motor vehicle safety" is defined as follows:

> the performance of motor vehicles or motor vehicle equipment in such a manner that the public is protected against unreasonable risk of accidents occurring as a result of the design, construction or performance of motor vehicles and is also protected against unreasonable risk of death or injury to persons in the event accidents do occur, and includes non-operational safety of such vehicles.

15 U.S.C. § 1391. In de novo proceedings to enforce NHTSA directives, therefore, the United States carries the burden of establishing by a preponderance of evidence, first, the existence of a "defect," and second, that that defect relates to "motor vehicle safety."

■ On motion for summary judgment, as in the present case, the United States must establish that there is no material fact genuinely in dispute, and that it is entitled to judgment as a matter of law. An alternative formulation of this burden, more directly applicable to this case, is that a movant is entitled to summary judgment if his showing of uncontested facts and unrebutted presumptions would entitle him to a directed verdict at trial, were one held. A motion initially making such a showing will succeed unless its opponent is capable of

> demonstrating "a ground of defense fairly arguable and of a substantial character," or unless he presents good reasons, in accordance with Rule 56(f), for the failure to offer "facts essential to justify his opposition" . . . .

*United States v. General Motors Corporation, supra* at 442 (footnote omitted).

■ A method by which the existence of a defect may be shown under the Act has been well established. In the *General Motors* case, *id.* at 438, it was held that to establish a defect, the United States need only show a significant number of failures occurring in ordinary operation, as to which age alone or causes such as expected wear and tear and abuse have been excluded. Such a showing has been conceded on this record, and the Court accordingly holds that the bracket here in question is in fact a defect within the meaning of the Act.

■ The statutory definition of the term "motor vehicle safety" turns upon the language "unreasonable risk of accidents . . . and . . . of death or injury to persons in the event accidents do occur . . . ." 15 U.S.C. § 1391(1). The Court has found no precedent interpreting this language which clearly controls the present case.

Ford asserts that the United States must demonstrate on the record a likelihood that a significant number of serious accidents and injuries will occur in the future in order to prevail on its motion for summary judgment. The record as it now stands demonstrates to the Court that such is the case.

Since the time when the automobiles in question were originally manufactured there have been a substantial number of failures, during normal operation, of the inboard driver's seat brackets on 1968–69 Cougar and Mustang automobiles caused by metal fatigue. The record demonstrates that while such failure is more likely to occur while the automobile is at rest, it can and has occurred a substantial number of times while the automobile is moving at varying speeds.

The record shows that the failure of the inboard bracket of the driver's seat, while the car is in motion, causes a momentary loss of control of the vehicle for upwards of several seconds.

**1244**

It is beyond dispute that under prevailing traffic conditions even a momentary loss of control of a moving vehicle presents imminent danger of an accident with the grave possibility of resulting personal injury or death.

The number of past failures of the bracket due to metal fatigue are such that the Court may infer, even presume, that in the future there will be a substantial number of inboard bracket failures on the driver's seat of the 500,000 Cougars and Mustangs still in operation and that such failures will create an unreasonable risk of injury or death. While it is true that the record is barren of any showing of fatalities in the past due to bracket failure, we must recognize that the reporting and recording of the causes of accidents, particularly fatal accidents, is but fragmentary in this country. *See* Plaintiff's Reply to Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment, filed September 24, 1976, pages 17–18. The causes of a great number of fatal accidents is never known, for dead men tell no tales.

The nature of the defect in this case, the number of failures which have occurred in the past, the likelihood of failure in the future, and the loss of control when a failure occurs all point to a likelihood of fatalities in the future if the defective brackets are not replaced.

The Court, therefore, grants plaintiff's motion for summary judgment.

Counsel will present an appropriate order.