**UNITED STATES of America, Plaintiff,**

v.

**FORD MOTOR COMPANY, Defendant.**

Civ. A. No. 76–29.

United States District Court,
District of Columbia.

July 6, 1978.

Nicholas H. Diacou, Steven Frank, Dept. of Justice, Washington, D.C., for plaintiff.

James Robertson, Michael L. Burack, S. Allen Early, III, Wilmer, Cutler & Pickering, Washington, D.C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN LEWIS SMITH, Jr., District Judge.

This case was filed under the vehicle recall provisions of the National Traffic and Motor Vehicle Safety Act of 1966, as amended, 15 U.S.C. §§ 1381–1431. The United States seeks an order declaring that the 1971–1973 Capris produced prior to November 24, 1972 contain a "defect" which "relates to motor vehicle safety" and requiring the manufacturer to (1) immediately notify owners, purchasers and dealers of the existence of the defect and (2) remedy the defect free of charge.

In March 1975 the Office of Defects Investigation of the National Highway Traffic Safety Administration (NHTSA) issued an investigative report relating to its investigation of the windshield wiper pivot assemblies on the model years 1971–1973 Capri automobiles.

NHTSA made an initial determination that the defect related to motor vehicle safety and notified the defendant by letter dated April 2, 1975. On May 15, 1975 NHTSA held a hearing at which defendant was provided an opportunity to present data and arguments, but not to confront or cross-examine NHTSA personnel. The Administrator adopted the findings of the investigative report and made a final determination of a safety related defect. On January 7, 1976 the government filed this action to enforce the Administrator's final determination and directive and to impose civil penalties on defendant.

Since Ford has stipulated that the government has made its prima facie case that the Design Level I pivot assemblies contain a "defect" within the meaning of the Safety Act, and will not contest that the Design Level I pivot assemblies contain such a defect,[1] the defectiveness of Design Level I pivot assemblies is not in issue.

The remaining contested issues are:

(1) whether the "defect" in the Design Level I pivot assemblies (as described above) "relates to motor vehicle safety" within the meaning of Sections 102(1) and 152(b) of the Safety Act, 15 U.S.C. §§ 1391(1) and 1412(b);

(2) whether the Design Level II pivot assemblies contain a "defect" within the meaning of Section 102(11) of the Safety Act, 15 U.S.C. § 1391(11); and

(3) if the Design Level II pivot assemblies do contain such a "defect", whether that "defect" "relates to motor vehicle safety" within the meaning of Sections 102(1) and 152(b) of the Safety Act, 15 U.S.C. §§ 1391(1) and 1412(b).[2]

On January 15, 1976 an evidentiary hearing was held and Ford's motion to enjoin the imposition of penalties was granted. On September 23, 1976 the Court denied defendant's motion to dismiss or for sum-

---

1. "Stipulations" of the parties, filed April 4, 1978, p. 1.

2. *Id.*, pp. 1–2.

mary judgment and on January 16, 1978 the Court denied the government motion for summary judgment. Trial de novo was held on April 17, 1978. Based upon the evidence and record compiled at earlier hearings and the trial de novo, the Court makes the following findings.

## FINDINGS OF FACT

1. The Ford Motor Company ("Ford"), defendant herein, a Delaware corporation which maintains its principal office and place of business in Dearborn, Michigan, is, and at all times relevant to this action has been, engaged in the transaction of business in, and under the laws of, the District of Columbia, all within the jurisdiction of this Court.

2. Ford is, and at all times relevant to this action has been, a manufacturer engaged in interstate commerce within the meaning of Section 102 of the National Traffic and Motor Vehicle Safety Act of 1966 (the "Safety Act"), as amended, 15 U.S.C. § 1391, and subject to the provisions of the Safety Act, 15 U.S.C. §§ 1381 et seq.

3. The Secretary of Transportation has delegated the authority to carry out the Safety Act to the National Highway Traffic Safety Administrator ("Administrator").

4. The Administrator has delegated to the Associate Administrator for Motor Vehicle Programs the authority to make initial determinations of the existence of defects related to motor vehicle safety in classes of motor vehicles and motor vehicle equipment.

5. Approximately 187,000 of defendant's model year 1971–1973 Capri vehicles which were manufactured and imported into the United States for sale and introduced and delivered into interstate commerce had windshield wiper assemblies installed between January 19, 1970 and November 24, 1972.

6. This case involved the windshield wiper pivot assemblies on model year 1971–1973 Capri automobiles produced by Ford Werke, A. G., Cologne, Federal Republic of Germany ("Ford of Germany") between January 19, 1970 and November 24, 1972. The pivot assemblies fall into two Design Levels, I and II. The model years of Capri automobiles equipped with Design Level I and Design Level II windshield wiper pivot assemblies, the periods during which they were produced and the approximate number of such cars produced for sale in the United States in each period are as follows:

| DESIGN LEVEL | MODEL YEAR | PRODUCTION PERIOD | APPROXIMATE NUMBER OF CAPRIS PRODUCED FOR SALE IN THE UNITED STATES |
|---|---|---|---|
| I | 1971 | Jan.19,1970 to Aug. 1,1971 | 66,500 |
| I | 1972 | Aug. 1,1971 to Nov.19,1971 | 25,000 |
| II | 1972 and 1973 | Nov.19,1971 to Nov.24,1972 | 95,500 |

7. As of January 1, 1978, approximately 71,000 Design Level I and 82,000 Design Level II Capris remained in use in the United States.

8. The replacement part numbers of pivot assemblies intended for use on Design Level II Capris are as follows:

Right side: D2RY–17566–B
Left side: D2RY–17567–B

9. Ford had not contested that the Design Level I pivot assemblies contain a "defect" within the meaning of Section 102(11) of the Act, 15 U.S.C. § 1391(11). There is a contested issue of fact as to whether the

Design Level II pivot assemblies contain such a "defect."

10. The government has placed in the record a number of Ford internal documents that where prepared approximately contemporaneously with the production of the Capris. Government Exhibit 19 (which had previously been denominated Exhibit 16 to the Government's summary judgment motion) consists of 27 internal Ford documents totalling 85 pages. Government Exhibit 22 is a separate internal Ford document.

11. By letter dated December 30, 1975, the Administrator determined that a defect which relates to motor vehicle safety exists with respect to the windshield wipers installed on 1971–73 model year Capris. In the letter of December 30, 1975, the Administrator directed the defendant to furnish the notification and remedy specified in Sections 153 and 154 of the Act, 15 U.S.C. §§ 1413 and 1414 (1976 Supp.), to the owners of such vehicles, as provided in Section 152(b) thereof, 15 U.S.C. § 1412(b) (1976 Supp.).

12. Since December 30, 1975, Ford has refused and failed to furnish the notification and remedy under Section 108(a)(1)(D)(i), (ii), 15 U.S.C. § 1397(a)(1)(D)(i), (ii) (1976 Supp.).

13. The Design Level I windshield wiper pivot assembly consists in part of a zinc die cast, knurled wiper arm drive (sometimes referred to as the "knurled drive"), pressed onto the splined end of a case hardened, steel pivot shaft; there is no staking operation and no nickel plating. This component is intended to last the lifetime of the vehicle.

14. The Design Level II windshield wiper pivot assembly consists in part of a zinc die cast, knurled wiper arm drive pressed onto the splined end of a non-case hardened, nickel plated, steel pivot shaft. After these parts are press fit together, the end of the pivot shaft is "staked" by impact with a tool which leaves a cruciform impression. This component is designed to last the lifetime of the vehicle.

15. The specific components at issue in this case constitute that portion of the windshield pivot assembly protruding through the windshield cowl panel. This portion basically consists of a housing, pivot shaft, and a knurled arm drive, together with associated washers and bearings. The windshield wiper arm is attached to the knurled drive by means of a "press fit". Likewise, the knurled drive is attached to the pivot shaft by means of a "press fit". Both the windshield wiper arm and the knurled drive rely on friction for their retention to the components to which they are attached. Essentially, the function of the windshield wiper pivot assembly is to convert motion produced by the windshield wiper motor to motion used to move the windshield wiper arm and blade across the windshield. The failure mode at issue in this case involves the windshield wiper arm becoming detached from the windshield wiper pivot assembly during normal operation, resulting in the arm and blade flying or falling off the Capri. In addition to the above, the windshield wiper pivot assembly consists of a flat auxiliary arm drive extending perpendicularly from the bottom of the pivot shaft and housing. At the end of the auxiliary arm drive opposite from the pivot shaft and housing is a spherical pivot pin. The windshield wiper pivot assembly is attached to a windshield wiper linkage by pressing the pivot pin into a bushing on the end of the linkage. The linkage connects the windshield wiper pivot assembly to the wiper motor. The pivot pin designed for installation in Capris manufactured prior to November 19, 1971, is flanged. The pivot pin designed for installation in Capris manufactured after November 19, 1971, and prior to November 24, 1972, is not flanged. The windshield wiper linkage, the pivot pin, and whether or not the pivot pin is flanged, are all unrelated to the failure mode at issue in this case.

16. Ford has provided the following replacement part sales figures:

DOMESTIC SALES OF CAPRI WINDSHIELD
WIPER PIVOT REPLACEMENT PARTS

DESIGN LEVEL I (Intended for use on 1971 model year Capris)·

| Sales for Calendar Year | Right Side | Left Side | Total |
|---|---|---|---|
| 1970 | 571 | 336 | 907 |
| 1971 | 3899 | 1904 | 5803 |
| 1972 | 4975 | 2458 | 7433 |
| 1973 | 6271 | 3589 | 9860 |
| 1974 | 5654 | 3512 | 9166 |
| 1975 | 4942 | 3812 | 8754 |
| 1976 | 3816 | 3574 | 7390 |
| 1977 | 2974 | 3353 | 6327 |

DESIGN LEVEL II (Intended for Use on 1972 and 1973 model year Capris built prior to November 24,1972)

| Sales for Calendar Year | Right Side | Left Side | Total |
|---|---|---|---|
| 1970 | 0 | 0 | 0 |
| 1971 | 9 | 9 | 18 |
| 1972 | 3013 | 2241 | 5254 |
| 1973 | 2984 | 2669 | 5653 |
| 1974 | 2536 | 2800 | 5336 |
| 1975 | 1980 | 2820 | 4800 |
| 1976 | 1614 | 2827 | 4441 |
| 1977 | 1404 | 2820 | 4224 |

17. The government has also placed in the record, as government Exhibit 16, 110 pages that originally appeared as attachments to the NHTSA Investigative Report. Those pages are copies of documents that were prepared by Ford either in the normal course of its business or in response to information requests made by NHTSA during its investigation in this matter.

18. Of the 110 pages in government Exhibit 16, 108 do not discuss or mention failures of or problems with Design Level II pivot assemblies. Of the two remaining pages (pp. 661, 662), only one (p. 661) discusses an instance of separation of the knurled arm drive of the pivot shaft.

19. Ford has produced no Design Level I windshield wiper pivot assemblies for replacement part sale since at least September 1975. All components sold as replacement parts by Ford Motor Company to its dealers have, since then, included the knurled drive and pivot shaft configuration of Design Level II. These components have been sold in boxes marked with a part number that had previously been identified to the government as the Design Level I part number (DORY–17566–A or DORY–17567–A), and in boxes marked with a part number that had been previously identified to the government as the Design Level II part number (D2RY–17566–B or D2RY–17567–B). These identifying numbers are the basis for the numerical breakdown of Design Level I and Design Level II replacement parts sales set out in finding number 16 above. There is no difference between those components in the Design Level II configuration sold in Design Level I boxes and those sold in Design Level II boxes other than in the construction of a sub-component thereof (the "pivot pin") which (a) is located on the opposite end of the pivot assembly from the knurled drive (arm drive) and (b) has nothing to do with the retentive capabilities of the knurled drive

on the pivot shaft or the windshield wiper arm on the knurled drive.

20. Mr. Paul Stutenkemper is currently Executive Engineer within the Body-in-White Activity of the Body Engineering Department of Ford of Germany. Mr. Stutenkemper worked in the Body Engineering Department from 1968 through the present, and he was an engineering manager within that department from 1968 through 1974. From 1968 through the present, Mr. Stutenkemper's responsibilities have included the windshield wiper components on the Design Level I and II Capris. Mr. Stutenkemper was personally involved in the designing and production of the windshield wiper pivot assemblies on the Capris, including the determination of the performance criteria for the pivot assemblies.

21. Since initial production through calendar year 1977, 29,726 windshield wiper pivot assemblies having the Design Level II pivot shaft and knurled drive configuration have been sold in Design Level II boxes for replacement part purposes.

22. Design Level III pivot assemblies, which had previously been developed for use on the European Granada, were introduced on Capris produced after November 24, 1972. The government does not contend that the Design Level III pivot assemblies are defective.

23. The continuing high rate of sales of replacement parts having the Design Level II pivot shaft configuration can be explained by frequent failure of Design Level II parts. Because parts having the Design Level I configuration went out of production at an early date, and not later than September 1975, it is improbable that these parts would have continued to fail in numbers sufficient to explain the high rate of replacement parts sold in the most recent years. Dr. Alan Tetelman, a witness called by Ford, testified that when parts fail because they are made out of specification, as the Court finds to be the case in the findings set out below, they are likely to fail early in their lives, during the so-called "infant mortality" period, and their failure rate may then be expected to decline sharply. No such decline may be observed in the rate of replacement sales of wiper assemblies.

24. The Court finds that the failure rate of all wiper assemblies, which has resulted in this continually high rate of replacement parts sales, includes a significant number of failures of parts which were themselves replacements of earlier failed parts.

25. A significant number of Design Level I windshield wiper pivot assemblies are defective and experienced failure in actual field operation because they were not manufactured in accordance with Ford's design specifications. A similar problem exists with respect to the Design Level II components available to consumers. Not only are there a significant number of these components not manufactured in accordance with specifications, but the depth of the stake on the pivot shaft has been shown to vary from component to component. These manufacturing variances would tend to weaken the Design Level II components and result in failures in the field.

26. It is physically possible to use Design Level II pivot assemblies as replacements for the pivot assemblies in Design Level I vehicles.

27. The various design changes introduced by Ford which distinguish the Design Level II from the Design Level I windshield wiper pivot assemblies did not increase the retentive capabilities of the Design Level II knurled drive. The retentive capability of the Design Level II knurled drive to the pivot shaft is no better than its Design Level I counterpart. These conclusions are drawn not only from the pull-off and torque tests performed by Ford in preparation for trial but from the durability tests as well.

28. Government Exhibit 22 is the Ford of Germany Change Request for the adoption of Design Level III pivot assemblies on Capris. Nothing in the Change Request refers to failure of Design Level II pivot assemblies or to separation of the knurled drive from the pivot shaft. On June 18, 1971, before the Design Level II

assemblies went into production, Ford recommended adopting a "bolt-on" design and released that recommendation for production.

29. Mr. William Koeppel, an engineer in the Engineering Analysis Department of Ford's Automotive Safety Office, testified that there are several ways to determine whether a subject Capri is a Design Level I or a Design Level II vehicle. All model year 1971 Capris are Design Level I vehicles. The Vehicle Identification Number ("VIN") of each car contains a letter code from which it can be determined in what month the vehicle was built and thus what Design Level the vehicle is. Other information, such as date of purchase or involvement in some other recall campaign, may allow the Design Level of the vehicle to be determined.

30. An analysis of sales receipts, letters sent to either Ford or the government, affidavits filed by the government with its motion for summary judgment in this action, and some depositions of Capri owners taken by the government indicate that from 1973 through 1977 61,980 of the 65,951 Design Level I and Design Level II windshield wiper pivot assemblies sold or installed as replacement parts were installed on Capris originally equipped with Design Level I components and only 3,971 were installed on Capris originally equipped with Design Level II components. These values are known as "point estimates".

31. At the trial, Ford proffered testimony designed to show that certain durability tests performed by Ford in preparation for litigation showed that the Design Level II components were less likely to fail than Design Level I components subjected to the same tests. Ford also alleged that pull-off and torque tests which were a part of the same test program were less probative of the actual field performance of the Design Level II pivot assemblies than these durability tests. Dr. Alan Tetelman failed to consider the high replacement part sales of Design Level II components.

32. On January 1, 1967, Ford Motor Company stated that it "supports . . .

the establishment of uniform minimum performance requirements for windshield wiping and washing systems" and later that year supported a proposed extension of such requirements "to passenger cars of less than 68 inches overall width."

33. Testimony offered by Ford at trial with respect to driver seeing distances in rainfall intensities of one-half inch per hour is not persuasive and of little probative value because the test data were obtained under unrealistic conditions and do not support the conclusions drawn from them. Field Test No. 1 was conducted in a parked car. Field Test No. 2 was conducted for the most part on a little used gravel road in a rural area. Field Test No. 3 was conducted on a Ford Test Track; the driver was asked to stop short of a parked vehicle. Field Test No. 4 involved a moving vehicle on a public road, but the driver was asked to do nothing in connection with the test. The passenger was the test subject in Field Test No. 4. None of the test trials were performed at night.

34. In rebuttal, the government's expert statistician, Harry Weingarten, criticized Mr. Koeppel's analysis in general terms. On cross-examination, however, Dr. Weingarten conceded that Mr. Koeppel's equations were correct, that Mr. Koeppel's algebra and arithmetic were correct, that there were no errors in Mr. Koeppel's calculations, and that the values Mr. Koeppel calculated were the values that he should have obtained from the date on which he relied. Dr. Weingarten criticized Mr. Koeppel's calculation because it was a "point estimate" calculation, rather than a "confidence interval estimate" calculation, and thus did not contain a rigorous statistical quantification of the degree of uncertainty in the result.

35. Mr. Stutenkemper was personally involved in determining the performance criteria for the Design Level I and II pivot assemblies. The basic performance criterion was that the assemblies have an operational lifetime of 500 hours which corresponds to approximately 1,500,000 cycles of operation. That criterion represented the lifetime requirement for the windshield

wiper system in real life operation on vehicles in service.

36. Mr. Stutenkemper and Alan Tetelman, an expert witness for Ford in the area of metallurgy and materials science, together formulated an extensive program of testing. The program used Design Level I and II pivot assemblies that were manufactured so as systematically to encompass a range of interference fits between the knurled drive and the pivot shaft, including not only interference fits within the ranges specified by the blueprint but also interference fits below the specified ranges. Systematically varying interference fits were used. The program included tests designed to measure: (1) the durability performance of Design Level I and II pivot assemblies under dynamic (operational) conditions; (2) the force required to pull the knurled drive axially from the pivot shaft under static conditions; and (3) the torque required to strip the knurled drive torsionally from the pivot shaft under static conditions. The durability tests (which included some with simulated packed snow loads on the windshield) were designed to test the pivot assemblies for 2,000,000 cycles of operation.

37. The purposes of the test program were to determine: (1) whether parts that met dimensional specifications for interference fit would perform satisfactorily; (2) how parts that fell below the specified ranges of interference fit would perform; (3) how much margin of safety was present in the design of the pivot assemblies; and (4) whether overall Design Level II pivot assemblies perform better than Design Level I assemblies in actual service. The testing was conducted almost continuously throughout a period of about a year. The testing was done at the Ford of Germany Testing Operations Laboratory in Cologne under the supervision of Mr. Stutenkemper.

38. The durability tests were set up so as to simulate in-service loads on the pivot assemblies. Dr. Tetelman testified, on the basis of electron-microscope photographs of actual field failure and of tested parts, that durability tests in fact simulated the mode of failure that occurs in the field. His conclusion rested upon the fact that durability-tested parts and field-failed parts exhibit similar deformations associated with a rocking motion of the cap on the pivot shaft, while parts subjected only to pull-off or torque tests do not. The government's expert witness, Volker Weiss, also testified that field-failed parts and durability-tested parts share a broadening of the grooves toward the blunt end of the knurled drive and thus exhibit a different groove profile from parts subjected only to pull-off tests or torque tests.

39. In addition to the durability tests that used pivot assemblies with systematically varying interference fits, special durability tests of 2,000,000 cycles were run using Design Level I and Design Level II assemblies randomly collected from vehicles actually in service in the United States.

40. Dr. Weiss made various dimensional measurements on 44 pivot assemblies. He testified on direct examination that only four of the 44 pivot assemblies met all the dimensional specifications set forth in the blueprint. On cross-examination he stated that the blueprint specifications for the knurled drive and pivot shaft were for the pre-assembly dimensions of those parts, while his own measurements were made after the parts had been assembled and then forcibly pulled apart.

41. Two other dimensions measured by Dr. Weiss (shown as B and E on Ford Exhibit 14) affect the degree of retentiveness between the pivot shaft and the arm drive, because those dimensions together determine the length of the engagement between the two parts; the longer the engagement length the more retentive the parts will be, and vice versa.

42. All fifty States and the District of Columbia require that windshield wiper systems be in good working order as a part of mandatory automobile safety equipment.

43. In one year alone, drivers of the Capris which are the subject of this litigation will spend more than 8,000 hours driving in rainfall intensities in excess of one-half inch per hour at speeds of 60 miles per hour.

44. Driving is an information processing task. Before the driver can make a decision he must be provided with information. The role of vision in driving is believed to constitute over 90% of the information input to the driver. Regardless of the exact percentage, without a doubt, visual perception is paramount in vehicular control. In fact, most researchers working in the area of traffic safety admit that vision is the one human sense that is absolutely essential for driving.

45. Ideally, the driver should be provided with an unobstructed field of view. During rain however a non-uniform layer of water could accumulate on the driver's windshield. This non-uniform layer of water is the most important factor contributing to the degradation of forward visibility. For example, in real rain this accumulation of water on an automobile windshield was found to degrade test subjects visibility from 20/20 to 2/43 (0.3 in./hr. rain rate), 20/73 (0.655 in./hr. rain rate), and 20/200 (2.16 in./hr. rain rate). Windshield wipers have been found to be very effective, even at low speeds, in restoring significant quantities of visual information in rain or snow that would not be available to the driver if they were not operating.

46. Published reaction time data generally relied upon by researchers show that a driver will do nothing for about two and one-half seconds after perceiving a particular condition or phenomenon. After two and one-half seconds the driver will become alert and be ready to respond. Under normal driving conditions drivers generally maintain a preview time of 3–5 seconds. If the driver's preview time goes down for some reason, he will have a shorter time to react to any given situation in the road ahead. It has been shown that windshield wiper failure may result in the preview time of the driver experiencing it dropping to about two seconds, one-half second lower than the two and one-half second decision-reaction time described above.

47. Visual information acquisition failure due to sampling the wrong information, the right information at the wrong time, or failure to sample at all are far more related to accident causation than motor processes or control failure. Rear-end collisions and run-off-road accidents, two of the more common accidents found today, clearly suggest the failure of the visual information sampling process and subsequent information processing.

48. No expert offered at trial could conclude that it is safe to drive an automobile in the rain without windshield wipers. Since safe performance in operating an automobile is largely a result of the information acquired visually and windshield wiper failure results in severe degradation of visual performance, it would be unreasonable to operate an automobile in the rain without windshield wipers. The consequences of windshield wiper failure indicate that it presents the driver with a severe threat to his safety and an increased risk that he will be involved in an accident.

49. When properly functioning, the windshield wipers clean rain, snow, road splatter, direct or other moisture from the windshield and maintain adequate forward visibility.

50. When one or both windshield wipers fail, drivers may be, and have been, distracted by the failure. When drivers are distracted by windshield wiper failure, forward visibility may be, and has been, impaired.

51. When one or both windshield wipers fail, rain, snow, road splatter, dirt, or other moisture may collect, and has collected, on all or part of the windshield. When rain, snow, road splatter, dirt, or other moisture collects on all or part of the windshield, forward visibility may be, and has been, impaired.

52. When forward visibility is impaired as a result of windshield wiper failure, drivers may experience, and have experienced, mental and emotional reactions (including distraction from attention, anger, fear, and panic) which may impair, and have impaired, their ability to safely and rationally respond to the situation.

53. The evidence indicated that when forward visibility is impaired, as a result of windshield wiper failure, drivers have reduced their speed below the prevailing speed of other vehicles on the road or have brought their vehicles to a stop in or along side lanes intended for moving traffic.

54. Vehicle collisions and resultant property damage may be, and have been, caused by windshield wiper failure. When such collisions occur, persons may be, and have been, injured.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction pursuant to Title I of the National Traffic and Motor Vehicle Safety Act of 1966, as amended (The "Safety Act"), 15 U.S.C. § 1381 *et seq.*

2. Ford is a "manufacturer" within the meaning of Section 102(5) of the Act, 15 U.S.C. § 1391(5).

3. The government seeks an order requiring Ford to recall the Design Level I and Design Level II Capris and to remedy or replace the pivot assemblies on them without charge to the owners. To establish its entitlement to such relief, the government must show (1) that the vehicles contain a "defect" within the meaning of Section 102(11) of the Act, 15 U.S.C. § 1391(11) and (2) that any such defect "relates to motor vehicle safety" within the meaning of Sections 102(1) and 152(b) of the Act, 15 U.S.C. §§ 1391(1) and 1412(b).

4. The Safety Act defines a "defect" as "any defect in performance, construction, components, or materials in motor vehicles or motor vehicle equipment." 15 U.S.C. § 1391(11).

5. The government made its *prima facie* case that the Design Level I pivot assemblies contain a "defect" within the meaning of 15 U.S.C. § 1391(11). Ford did not contest that the Design Level I pivot assemblies contain such a "defect". Therefore, as a matter of law, the Design Level I pivot assemblies contain a "defect" within the meaning of 15 U.S.C. § 1391(11).

6. The government has shown that the Design Level II parts are just as likely to fail and have the same problem of knurled drive separation as the admittedly defective Design Level I components. The changes made from Design Level I to Design Level II did not improve the retentive capabilities of the Design Level II parts. Actual Design Level II components purchased off Ford and Lincoln-Mercury dealers' shelves were found to have been manufactured outside Ford manufacturing tolerances. Depth of the stake was found to vary widely from component to component. A comparison of tests performed by Ford shows that the Design Level II components are no better than their Design Level I counterparts in terms of pull-off force capability. The government has shown that a "defect" "in the sense of an error or mistake in design, manufacture or assembly" exists in the Design Level II components.

7. The United States has established the existence of a defect in performance of the Design Level II components by showing a "significant number of failures" in past operation.

> Where . . . the relevant component is designed to function without replacement or repair for the life of the vehicle a *prima facie* case of defect can be made simply by showing a significant number of failures. . . . The number of failures need not be and normally will not be a substantial percentage of the total number of components produced. *United States v. General Motors Corp.*, 171 U.S. App.D.C. 27, 518 F.2d 420 (1975).

The performance of the Design Level II windshield wiper pivot assemblies can be assessed by the sales of replacement Design Level II components.

8. "Motor vehicle safety" as defined by the Safety Act, means:

> [T]he performance of motor vehicles or motor vehicle equipment in such a manner that the public is protected against unreasonable risk of accidents occurring as a result of the design, construction of performance of motor vehicles and is also protected against unreasonable risk of

death or injury to persons in the event accidents do occur, and includes nonoperational safety of such vehicles. 15 U.S.C. § 1391(1).

9. The basic purpose of the Safety Act is to reduce motor vehicle accidents, injuries, and property damage.

 10. The government has shown that windshield wipers provide the driver with "an added area of safety" in inclement weather. Specifically, windshield wipers clear rain, snow, road splatter, dirt, or other moisture off the windshield and permit the driver to enjoy adequate forward visibility. Visibility is of paramount importance to the safety of the driver of a motor vehicle. The risk of windshield wiper defect as to these drivers is an unreasonable risk under the Safety Act.

11. Loss of one or both windshield wipers strips away the "added area of safety" they provide. Drivers faced with sudden and unforewarned windshield wiper failure in inclement weather have lost some or all of their forward visibility. This loss of visibility has impaired the ability of drivers to read road signs and therefore resulted in the loss of important safety information printed on them. Drivers have been distracted by the failure (i. e. windshield wiper flies off) itself, further impairing visibility. The impairment of forward visibility has caused drivers to experience emotional reactions which impair their ability to safely and rationally respond to the situation. Their perception/reaction time is reduced to a hazardously short period. Drivers have been forced to reduce the speed of their vehicles below the prevailing speed of other traffic. In order to improve their visibility, drivers have been forced to assume unnatural, awkward, and unsafe driving positions. Even if drivers pull to the side of the road and bring their vehicles to a stop on the shoulder they are still exposed to the risk of being struck from behind by a moving vehicle. Some drivers, unable to proceed because of loss of forward visibility, have even brought their vehicles to a stop in the middle of lanes intended for moving traffic. Having brought their vehicles to a stop,

drivers imperiled by the windshield wiper failure have exited their vehicles in order to extricate themselves from the unsafe circumstances into which they have involuntarily been thrust. This too exposes them to the further risk of being struck by a moving vehicle. Vehicle collisions and attendant injuries have been associated with windshield wiper failure in the past.

For the foregoing reasons, the Court concludes that the Design Level I and Design Level II pivot assemblies contain a "defect" and that said "defect" poses an unreasonable risk within the meaning of the Safety Act.

Accordingly, finding will be entered for the plaintiff. Counsel for the government will present an appropriate order within five days.